William Hamm, Jr. v. Commissioner. Marie H. Hamm v. Commissioner.
Hamm v. Commissioner
Docket Nos. 67131, 67132.
United States Tax Court
T.C. Memo 1961-347; 1961 Tax Ct. Memo LEXIS 2; 20 T.C.M. (CCH) 1814; T.C.M. (RIA) 61347; December 28, 1961
*2 The principal petitioner, during the calendar year 1953, made gifts by transfers in trust of 263 1/3 shares of the common stock of United Properties, Inc., a family investment and holding corporation; and said donor and his wife elected in their gift tax returns to have the gifts treated as having been made one-half by each of them. Any net income which the trusts might derive from said gifts prior to March 1, 1964, was to be paid over to The Hamm Foundation, a charitable corporation; thereafter until January 1, 1970, any such income was to be accumulated by the trusts; and on the last-mentioned date, all accumulated income and all corpus of each of the trusts was to be distributed to one or another of the donor's sons if living, or otherwise to members of the Hamm family or others. United Properties, Inc. had never declared or paid any dividend on its shares of common stock since its incorporation 16 years previous; and it could not pay any such dividend after the date of the gifts unless its directors first paid $3,685,500 of delinquent, accumulated and unpaid dividends on the company's preferred stock, with respect to which no dividend had been declared or paid since 1941. At the *3 time of the gifts involved, there was no probability or expectation of petitioners that United would pay any dividend on its common stock within the foreseeable future. 1. Held: Fair market value of the shares of common stock of United Properties, Inc., as of the date of the gifts, determined. 2. Held: Because at the time of the gifts, it was improbable that the charity would ever derive any net income in respect of the gifts involved, and also because in such circumstance the value of the charity's interests in the gifts were not susceptible of valuation, no charitable deduction is allowable to either of the petitioners in respect of said gifts of common stock. 3. Held: No exclusion from gifts is allowable to either of the petitioners in respect of said transfers of common stock, because as before held the interests of the charity in the gifts were too contingent to be susceptible of valuation; and because the remainder interests in the gifts were "future interests." Joseph A. Maun, Esq., 425 Hamm Bldg., Saint Paul, Minn., William R. Busch, Esq., and Lawrence J. Hayes, Esq., for the petitioners. James Booher, Esq., and Thomas A. Steele, Jr., Esq., for the respondent. PIERCE Memorandum *4 Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in gift tax against the petitioners for the year 1953, as follows: Docket No.
Petitioner
Deficiency
67132
William Hamm, Jr.
$313,787.29
67131
Marie H. Hamm (wife
of William)
212,603.96 Also, in his amended answers to the petitions herein, the respondent asserted claims to increased deficiencies in such tax - thereby claiming a total deficiency against William in the amount of $456,138.53, and a total deficiency against Marie in the amount of $317,281.96. The cases were consolidated for trial. The issues presented for decision are: 1. What was the fair market value on the material valuation date in the calendar year 1953, of certain shares of common stock of United Properties, Inc., which petitioner William Hamm, Jr., at that time transferred by gift to two trusts? (The petitioners, as hereinafter shown, elected and consented in their gift tax returns to have such transfers by gift considered as having been made one-half by each of them.) 2. In computing the net gifts of each of the petitioners for the calendar year involved, what amounts (if any) are allowable to them in respect of said gifts, as exclusions from *5 gifts, or as deductions for charitable gifts, under sections 1003 and 1004 of the 1939 Code? General Findings of Fact Some of the facts were stipulated. The stipulations of facts, together with the exhibits thereto attached and made a part thereof, are incorporated herein by reference. Petitioners William Hamm, Jr., and Marie H. Hamm, are and were at all times here material, husband and wife, citizens of the United States, and residents of Wayzata, Minnesota. They each filed a Federal gift tax return for the calendar year 1953, with the district director of internal revenue for the district of Minnesota; and in said returns they consented to have any gifts made by them to third parties in said year, considered as having been made one-half by each of them. The term "petitioner" will hereinafter have reference to William Hamm, Jr. On July 18, 1953, said petitioner created, by execution of written declarations of trust, two separate trusts entitled: William Hamm, Jr. 1953 Trust No. I For The Hamm Foundation, Inc. and Successor Beneficiaries (hereinafter referred to as "Trust No. I"); and William Hamm, Jr. 1953 Trust No. II For The Hamm Foundation, Inc. and Successor Beneficiaries (hereinafter *6 referred to as "Trust No. II"). In the written declaration for each of these trusts, he designated himself to be the sole trustee. The terms of these two trusts (which are hereinafter more fully described in our Findings of Fact respecting Issue 2) were practically identical, except for the designations of certain beneficiaries. The declaration for Trust No. I provided, in part and in substance: That all net income of the trust should, until March 1, 1964, be paid to The Hamm Foundation, Inc.; that from and after said date, all the net income should be accumulated until January 1, 1970; and that upon the latter date, all accumulated income and also all corpus of the trust should be distributed, free from any trusts to the petitioner's son Edward Hersey Hamm, if he should then be living, or otherwise to said son's issue then living, or in default of such issue to designated members of the Hamm family or others. As regards Trust No. II, on the other hand, the person to whom the accumulated income and the corpus were to be distributed on January 1, 1970, was petitioner's other son, William Hersey Hamm, if he should then be living. Subsequently, under date of December 31, 1953, petitioner *7 executed a First Addendum to each of said trusts, by which he made gifts of corporate stock to the respective trusts - which gifts are the subject of the present controversy. Under the Addendum to Trust No. I, petitioner delared that he, as trustee, stood irrevocably seized and possessed of 130 shares of the common stock of United Properties, Inc., (a Minnesota corporation), which had theretofore stood in his name individually. And under the Addendum to Trust No. II, he similarly declared that he, as trustee, stood irrevocably seized and possessed of 133 1/3 shares of the common stock of the same corporation, which had theretofore stood in his name individually. By the execution of these Addendums, petitioner effected (as the parties agree) transfers by gift, within the meaning of section 1000(a) of the 1939 Code - being a gift of 130 shares of said stock to Trust No. I, and a gift of 133 1/3 shares of such stock to Trust No. II. Petitioner and his wife, in their respective gift tax returns for 1953, consented as aforesaid to have said gifts considered as having been made one-half by each of them, pursuant to section 1000(f) of the 1939 Code. Petitioners also reported on their said *8 gift tax returns that the date on which each of said gifts had been made was December 30, 1953. This also was the date shown on Exhibit "B" of each of the Addendums wherein the shares of stock involved were described; although the date shown on the Addendums themselves was December 31, 1953. By reason of this situation, the parties hereto have stipulated for the purposes of this case: That the common stock of United Properties, Inc., had the same value on December 30, 1953, as it had on December 31, 1953; that facts respecting said stock, which were known and existing on December 31, 1953, would also have been known and existing on December 30, 1953; and that information respecting said stock, which is reflected in financial statements as of December 31, 1953, would also have been known and existing as of December 30, 1953. Accordingly, we here find and hold that the specific date within the calendar year 1953 on which each of the gifts of stock here involved was made, was December 30, 1953 - the date which the petitioners represented on their gift tax returns to have been the actual effective date of said gifts. Said date is hereafter sometimes referred to as the "material valuation *9 date." The foregoing general findings of fact pertain to the case generally. Hereinafter, we shall set forth separate and specific findings of fact and a separate opinion for each of the issues involved. I. Issue 1 - Findings of Fact United Properties, Inc. (hereinafter called "United") was organized under the laws of the State of Minnesota on December 30, 1937; and it has its office and principal place of business in St. Paul, Minnesota. It was organized by shareholders of Theo. Hamm Brewing Company, of St. Paul, for the purpose of having it hold certain real estate and other investments theretofore held by said Brewing Company. From time to time thereafter, it acquired additional real estate holdings; and it also either caused to be incorporated or acquired by purchase, the controlling stock interest in several corporations which engaged in commercial businesses. On the material valuation date here involved, it held either title or long-term leases for 68 parcels of real estate, most of which were improved properties located in the city of St. Paul; and it also held on said date, all or substantially all the shares of stock of 8 corporations located in or near St. Paul - 2 of which *10 corporations, in turn, were each the parent of a wholly-owned subsidiary corporation. In addition, United also held on the material valuation date: Certain United States bonds; certain listed and unlisted stocks and debentures of corporations which it did not control; and certain interests in oil and gas properties. These various investments are hereinafter more fully described. United's operations consisted principally of: Holding and managing its real properties; holding the stock of its subsidiaries, and its interests in the oil and gas and other properties; and receiving the rents, dividends and other income from such investments. It did not manufacture or produce any product; it did not act as a dealer in any real estate, securities or other property; and it seldom sold any of its investments. United's issued and outstanding capital stock, at all times from its incorporation through the material valuation date, consisted of 1,000 shares of common stock having a par value of $100 per share, and 35,000 shares of 7% cumulative preferred stock which likewise had a par value of $100 per share. None of the shares of either class was listed on any stock exchange, nor were any of such *11 shares traded in over-the-counter transactions. Although some shares of each class were the subjects of gifts, no shares of either class were ever sold. At the time of United's incorporation, all its shares of both common and preferred stock were issued to petitioner William Hamm, Jr., and his three sisters, Margaret Hamm Kelley, Theodora Hamm Lang and Marie Josephine Hamm Ankeny. The original issuance of the common stock was in the proportions of 400 shares to petitioner, and 200 shares to each of the sisters; and the original issuance of the preferred stock was to these same persons and in the same ratio. Immediately prior to the gifts of common stock here involved, the shares of United's preferred and common stock were held as follows: Number of
shares held
Shareholder
Preferred
Common
William Hamm, Jr. (petitioner)
9,366 2/3
263 1/3
William Hamm, Jr., as trustee for William Hersey Hamm (son of
petitioner)
2,333 1/3
66 2/3
William Hamm, Jr., as trustee for several other trusts created by him
2,300
70
Margaret H. Kelley (sister of petitioner)
7,000
None
James E. Kelley (husband of Margaret) as trustee for trust created
by her
None
200
Theodora H. Lang (sister of petitioner)
7,000
200
Marie Josephine H. Ankeny (sister of petitioner)
6,800
200
Kendall Ankeny Mix (child of Marie)
50
None
Sally Scheffer Ankeny (child of Marie)
50
None
DeWalt H. Ankeny, Jr. (child of Marie)
50
None
Michael Hamm Ankeny (child of Marie)
50
None
Total
35,000
1,000
*12 All the persons above mentioned were adults on the material valuation date, except Michael Hamm Ankeny, who was then about 13 1/2 years of age. The directors of United during the calendar years 1949 through 1953 were: Petitioner William Hamm, Jr.; James E. Kelley, husband of petitioner's sister Margaret; DeWalt H. Ankeny, husband of petitioner's sister Marie; and Joseph Maun, attorney for the petitioners and certain of the Hamm business interests. The officers of United during this same 5-year period were: James E. Kelley, president; David H. Sullwold, vice president; Joseph Maun, secretary; DeWalt H. Ankeny, treasurer; and Isabel Keenan, assistant treasurer. United's balance sheets per books, as of December 31, 1949, through December 31, 1953, were as follows (items summarized and figures rounded to nearest dollar): ASSETS
December 31
1949
1950
1951
1952
1953
Current Assets
Cash
$ 76,024
$ 239,838
$ 549,975
$ 346,434
$ 1,422,446 *
Marketable securities (at cost,
less amortization on bonds)
1,218,580
245,125
247,114
249,183
192,353
Notes and accounts receivable -
other than stockholders and
related companies
86,119
92,358
117,823
225,475
474,534
Notes receivable - stockholders
500,000
Notes and open accounts of sub-
sidiary and affiliated companies
649,169
2,100,927
2,513,101
2,730,798
2,708,421
Prepaid expenses
18,639
22,212
29,800
29,421
31,148
Total Current Assets
$ 2,048,931
$ 2,700,640
$ 3,457,813
$ 3,581,311
$ 5,328,902
Investments - at cost
Rental real estate, less depreci-
ation
$ 3,983,939
$ 3,916,287
$ 3,725,553
$ 3,648,147
$ 3,484,881
Unimproved real estate
306,347
179,616
154,533
155,917
155,917
Oil and gas properties, less de-
pletion
30,092
188,103
368,413
Notes, contracts and mortgages
receivable, secured in part
721,509
507,068
236,510
240,058
233,396
Investments in subsidiary com-
panies
3,252,834
3,327,459
3,327,459
3,352,459
2,902,050
Other investments
10,500
10,500
10,500
511,903
10,500
Sinking fund for retirement of
Mortgage bonds
155,827
170,592
194,686
211,334
216,188
Total Investments
$ 8,430,957
$ 8,111,523
$ 7,679,334
$ 8,307,921
$7,371,345
Property and Equipment, less depre-
ciation and amortization
$ 7,105
$ 8,606
$ 7,902
$ 9,555
$ 15,570
TOTAL ASSETS
$10,486,593
$10,820,768
$11,145,049
$11,898,787
$12,715,817
LIABILITIES AND NET WORTH
Current Liabilities
Accounts payable - trade
$ 32,628
$ 19,375
$ 21,190
$ 16,461
$ 23,765
Due to subsidiary and affiliated
companies
927
927
927
927
927
Due to Theo. Hamm Brewing Co.
1,142
676
1,376
475,676
94
Accrued expenses
351,607
456,334
409,070
394,950
396,451
Federal and state income taxes
300,570
289,381
321,443
313,627
294,971
Deferred income
7,697
7,394
8,574
6,132
15,758
Total Current Liabilities
$ 694,571
$ 774,087
$ 762,580
$ 1,207,774
$ 731,967
Long-term Liabilities
Mortgage bonds (see sinking fund
among assets)
258,402
252,057
245,474
238,646
227,142
TOTAL LIABILITIES
$ 952,974
$ 1,027,144
$ 1,008,054
$ 1,446,419
$ 959,009
Capital Stock and Surplus
Capital Stock
7% cumulative preferred stock
$ 3,500,000
$ 3,500,000
$ 3,500,000
$ 3,500,000
$ 3,500,000
Common stock
100,000
100,000
100,000
100,000
100,000
Capital surplus
2,859,680
2,859,680
2,859,680
2,859,680
2,859,680
Earned surplus
3,073,939
3,334,945
3,677,314
3,992,688
5,297,028
TOTAL NET WORTH
$ 9,533,619
$ 9,794,625
$10,136,994
$10,452,368
$11,756,708
TOTAL LIABILITIES AND
NET WORTH
$10,486,593
$10,820,768
$11,145,049
$11,898,787
$12,715,817
*13 United operated at a gain for all years ended December 31, 1949, through December 31, 1953. Summarized profit and loss statements for United, are as follows: [1] *14 1949
1950
1951
1952
1953
Revenues
$1,377,966.33
$1,401,955.93
$1,427,428.05
$1,457,248.83
$1,444,870.79
Less: Cost of revenues
827,582.41
869,071.59
834,157.88
867,334.25
860,552.17
Gross operating income
$ 550,383.92
$ 532,884.34
$ 593,270.17
$ 589,914.58
$ 584,318.62
Operating expenses
101,918.84
79,723.25
98,903.40
114,123.61
174,180.59
Net operating income
$ 448,465.08
$ 453,161.09
$ 494,366.77
$ 475,790.97
$ 410,138.03
Other income (net)
574,358.44
96,476.22
97,404.85
119,215.94
234,053.25
Net income before provi-
sion for income taxes
$1,022,823.52
$ 549,637.31
$ 591,771.62
$ 595,006.91
$ 644,191.28
Provision for income taxes
257,150.57
237,094.82
295,838.45
306,227.30
291,735.95
Net income after taxes
$ 765,672.95
$ 312,542.49
$ 295,933.17
$ 288,779.61
$ 352,455.33
NOTE: The term "Revenues" as used in the above profit and loss statements, reflects the gross receipts from rental properties, including rents and also fees from tenants for supplying electricity and steam heat. The term "Cost of Revenues" covers such items as taxes and ground rents, insurance, repairs, depreciation, and the cost of producing the steam and electricity sold to tenants. The term "Operating Expenses" includes such items as salaries, legal and professional expense, travel and entertainment expense, and other overhead expense. The term "Other Income" includes principally: Interest from bonds; dividends from subsidiary corporations in 1949, and from a former subsidiary in 1952; and capital gains derived in 1953 from sales of stocks of two corporations in which it then had holdings, Nicollet Land Company and Northland Insurance Company. As hereinabove found, United was organized on December 30, 1937. The following table shows: The stipulated amounts of its net income *15 after taxes, per books, for all years from the commencement of its operations through July 31, 1953; and the stipulated amounts of all dividends which it has at any time paid on its preferred stock and common stock: Dividends Paid
Income
Pre-
Com-
After
ferred
mon
Year Ending
Taxes
Stock
Stock
Nov. 30, 1938
$ 12,295.55
$122,500 *
None
Nov. 30, 1939
77,684.96
35,000
None
Nov. 30, 1940
40,849.92
24,500
None
Nov. 30, 1941
79,598.78
52,500
None
Nov. 30, 1942
80,650.59
None
Nov. 30, 1943
85,670.52
None
Nov. 30, 1944
$ 22,597.58
None
July 31, 1945 **
63,020.61
None
July 31, 1946
660,033.79
None
July 31, 1947
350,442.13
None
July 31, 1948
399,065.65
None
July 31, 1949
391,433.07
None
July 31, 1950
748,917.91
None
July 31, 1951
289,392.81
None
July 31, 1952
294,390.42
None
July 31, 1953
340,373.10
None The amount which would have been required for United to have paid currently, the 7 percent dividend on its preferred stock, was $245,000 per year. Delinquent preferred dividends were cumulative, but did not bear interest. As *16 of December 31, 1953, the amount of the delinquent, accumulated and unpaid dividends on the preferred stock was $3,685,500. United's articles of incorporation contained provisions to the effect: That no dividends could be paid on the common stock until all arrearages of preferred dividends had been satisfied; that in case of liquidation, the holders of the preferred stock would have preference over the common stockholders to the extent of the par value of the preferred shares, plus the delinquent, accumulated and unpaid preferred dividends; and that any or all outstanding shares of preferred stock were redeemable at any time at the option of the board of directors, at $105 per share plus accumulated and unpaid dividends thereon, without interest. The voting power was vested solely in the holders of the common stock. The following are more detailed findings of fact regarding the various real properties, subsidiary and affiliated corporations, and other miscellaneous property interests, which were included among the investments of United on the material valuation date. Re: United's Investments in Real Properties Hamm Building Property (Item No. 1000 [2]) - The Hamm Building was one of *17 the principal real estate assets owned by United on the material valuation date. It was a 6-story office and commercial building, covering about one-half of a city block, with frontage on three principal streets in the so-called "loop" business district of St. Paul. The building was erected in 1919 on property held under a 100-year lease, of which approximately 65 years of the lease term remained unexpired on the material valuation date here involved. The ground floor of the building was occupied by various tenants of United, for use as retail stores and a motion picture theater; and most of the upper five floors were leased by United to tenants for office use. The fair market value of United's interest in the Hamm Building property, on the material valuation date, was $1,445,000. [3] *18 Emporium Building Property (Item No. 347) - The Emporium Building was a large 5-story department store building which, together with an adjoining parking lot, occupied almost an entire city block on the fringe of the so-called prime business area, of St. Paul's "loop district." The main entrance of the building was at the corner of East Seventh and Robert Streets. Most of the land underlying the building and the parking lot was owned by United in fee; but two parcels thereof were held under long-term leases which, on the material valuation date, had unexpired lease terms of approximately 60 years and 52 years, respectively. The property was leased by United for retail department store purposes, to the Emporium of St. Paul, Inc., which was a wholly-owned subsidiary of United. The lease to this tenant was due to expire on July 31, 1954 (7 *19 months after the material valuation date). The fair market value of United's interest in the Emporium Building property, on the material valuation date, was $2,874,000. [4] Miscellaneous real properties as to which *20 there was conflicting opinion testimony. - The following table sets forth various real properties of United, as to which conflicting opinion testimony was presented by the parties. The table identifies these properties by item numbers and street addresses; shows the character of United's interests therein; and shows also opinions of fair market value on the material valuation date, as expressed by respondent's witness Muske and petitioners' witness Walker. All these properties were improved with commercial buildings occupied by tenants of United. Those properties which have University Avenue addresses were commercial properties located outside the downtown district of St. Paul, on one of the main thoroughfares leading to Minneapolis; and all others were located in the downtown business district of St. Paul. Said table is as follows: Opinion of Fair
Type of
Market Value
Item
United's
No.
Address
Interest
Muske
Walker
119
375-377 Wabasha St.
Fee
$ 261,000
$ 200,000
383
67-73 E. Seventh St.
Leasehold
680,000
465,000
999
72-74 E. Eighth St.
424
499-513 Wabasha St.
Fee
196,000
235,000
430
385-387 Wabasha St.
Fee
76,000
45,000
431
372-380 Wabasha St.
Fee
134,000
140,000
987
364-370 Robert St.
Leasehold
(189,000) *
11,000
994
995
418-426 Wabasha St.
Leasehold
328,000
300,000
996
25-31 E. Seventh St.
Leasehold
122,000
115,000
& Fee
998
364-370 Wabasha St.
Leasehold
(133,000) *
23,500
120
2418-2424 University Ave.
Leasehold
28,000
50,000
113
2426-2436University Ave.
Fee
114,000
140,000
114
2446-2448 University Ave.
Leasehold
90,000
37,500
193
2390-2400 University Ave.
Leasehold
208,000
180,000
414
2535University Ave.
Fee
107,000
70,000
Total
$2,022,000
$2,012,000
*21 The aggregate fair market value as of the material valuation date, of all the real properties listed in the foregoing table, was $2,022,000. [5]
Miscellaneous Improved and Unimproved Real Properties, as to which there was no conflict of opinion testimony. - The following table sets forth various improved and unimproved real properties of United, as to which *22 petitioners presented opinion testimony respecting fair market values, and as to which respondent presented no such opinion testimony. We have therefore given effect to the sole and uncontradicted opinion testimony of record, as follows: Improved Real Property
Address (All
Fair Market
Addresses Are in
Value on
Item
St. Paul, Except as
Material
No.
Otherwise Indicated)
Valuation Date
132
957-959 Payne Ave. & 634
Case St.
$ 28,000
134
880 East 7th St.
17,500
137
1101-1109 Arcade St.
8,000
142
1007-1009 Arcade St.
8,000
216
680 Dodd Road & 653 Stry-
ker Ave.
11,000
238
249East 7th St.
4,000
263
481 Mississippi St. & 580
Broadway
12,000
283
713-719 North Dale St.
30,000
309
117-119 South Wabasha St.
11,000
316
495-497 Wabasha St.
37,500
317
467-471 St. Peter St., & 43
West 9th St.
55,000
321
560-562 University Ave.
17,500
333
140-142 East 4th St.
30,000
339
109 Carroll Ave.
$ 4,000
356
924-926 Rice St.
30,000
375
527-529 St. Peter St. & 40-48
W. 10th St.
8,000
376
491 Wabasha St.
10,000
377
493Wabasha St.
20,000
380
579-581 Robert St.
12,500
387
82 West 7th St. & 147-149
West 5th St.
30,000
395
121-131 East 11th St.
35,000
400
581-583 East 7th St.
12,500
412
812 Berry St.
40,000
422
1195-1197 Jackson St.
2,500
426
114-118 South Wabasha St.
15,000
440
2375-2395 Myrtle Ave.
35,000
441
103 North Concord St.
75,000
442
237 Althea Lane, Hopkins,
Minn.
18,000
456
714-720 Hennepin Ave.,
Minneapolis, Minn.
350,000
462
3006 Cedar Ave. & 1817-1823
East Lake St., Minnea-
polis
30,000
474
84-90 Glenwood Ave., Min-
neapolis
140,000
475
312 South Ninth St., Min-
neapolis
80,000
476
215 East Lake St. & 3008
Third Ave., Minneapolis
40,000
499
217 North Concord St.
15,000
607
Long Island, Lake Winne-
pegosis, Canada
4,000
608
Long Island, Lake Winne-
pegosis, Canada
6,000
611
Barnesville, Clay County,
Minn.
55,000
777
Forsyth, Montana (Ranch-
617 acres)
15,000
828
602-694 Tower Ave., Su-
perior, Wis.
10,000
986
465-469 Wabasha St. & 3
West 9th St.
100,000
989
193-199 East 7th St. & 435-
437 Sibley
30,000
997
485-489 1/2 Wabasha St.
3,000
Total
$1,495,000
Unimproved Real Property
373
Vacant land, St. Paul
$ 8,000
433
Vacant land, St. Paul
5,000
438
Parking lots, St. Paul
40,000
470
Vacant land, St. Paul
18,000
471
Lots, Minneapolis, Minn
55,000
532
Acreage property, St. Paul
20,000
719
Timber land, Aitkin
County, Minn.
5,000
729
St. Louis County, Minn.
$ 1,000
Total
$ 152,000
Grand total for all im-
proved and unimproved
properties above listed
$1,647,000
*23 The aggregate fair market value, as of the material valuation date, of all real properties of every character, included in United's investments, was $7,988,000. In about 1943, United began to expand and diversify its investments, by either incorporating subsidiary companies or by acquiring substantially all the outstanding shares of stock of certain existing companies. [6] *24 The following facts pertain to subsidiary and affiliated corporations acquired by United, and included in its investments on the material valuation date. The Emporium of St. Paul, Inc. - This corporation was organized under the laws of Minnesota in 1944, following the bankruptcy of a predecessor corporation. It engaged on the material valuation date in operating a large department store in St. Paul, which occupied the entire 5-story Emporium Building owned by United, which has hereinbefore been described. This Emporium Company had two classes of issued and outstanding capital stock, consisting of Class A common and Class B common. One hundred percent of the shares of both of these classes of stock was held by United at all times from the company's incorporation through the material valuation date here involved. Neither class of stock was listed on any stock exchange; and no shares of either class of stock were ever sold or transferred. The Emporium Company's board of directors at all times from 1949 through 1953 consisted of: Petitioner William Hamm, Jr.; three of said petitioner's brothers-in-law, being the above-mentioned James E. Kelley, DeWalt H. Ankeny, and William H. Lang; and the company's president - who until January *25 31, 1953, was Russell Ratigan, and who thereafter was Russell Hunsinger. The balance sheet per books of the Emporium Company, as of December 31, 1953, was as follows: ASSETS
Current Assets
Cash
$ 560,415.32
Notes & accts. receivable -
Retail installment contracts
$ 642,832.93
Accounts receivable
1,606,228.12
Other notes & accounts receivable
520.94
$2,249,581.99
Less - Reserve for doubtful accounts
54,793.00
2,194,788.99
Merchandise inventories, priced at the lower of cost or market
1,817,164.39
Prepaid expenses, etc.
99,204.28
Total Current Assets
$4,671,572.98
Investments, at cost
3,454.55
Property & equipment, at cost
$2,310,057.34
Less - Accumulated depreciation
1,225,748.29
1,084,309.05
Total Assets
$5,759,336.58
LIABILITIES AND NET WORTH
Current Liabilities
Notes payable - Banks
$ 300,000.00
Accounts payable
253,985.93
Due to subsidiary & affiliated companies on notes
and open accounts
649,133.20
Accrued expenses
365,674.87
Federal & state income taxes
416,933.46
Total Current Liabilities
$1,985,727.46
Reserve for shrinkage & adjustments of merchandise inventories
177,251.99
Capital Stock and Surplus: Capital stock -
Common - Class A
$ 136,260.00
Common - Class B
1,147,300.00
Capital surplus
609,274.11
Earned surplus
1,703,523.02
Net Worth
3,596,357.13
Total Liabilities and Net Worth
$5,759,336.58
*26 The Emporium Company's net income after income taxes, its earned surplus, and its net current assets (all per books), for the periods hereinafter shown, were: Net income after
Year Ending
income tax
Earned Surplus
Net Current Assets
July 31, 1949
$112,285.29
(Not available)
(Not available)
Dec. 31, 1949 *
48,355.65
$ 871,254.26
$1,443,084.08
Dec. 31, 1950
270,784.22
1,292,225.18
1,792,142.61
Dec. 31, 1951
138,383.33
1,373,349.47
2,003,696.18
Dec. 31, 1952
155,187.38
1,571,449.71
2,396,681.23
Dec. 31, 1953
206,315.52
1,703,523.02
2,685,845.52
No dividends were paid by this company on either class of its capital stock, in any of the years above shown. Also, this company had no long-term liability in any of the years 1949 through 1953. The fair market value, as of the material valuation date, of United's 100 percent interest in the shares of capital stock of The Emporium of St. Paul, Inc., was $1,900,000. [7] *27 Industrial Credit Company and its subsidiary, Industrial Credit Plan, Inc. - These two related companies were, on the material valuation date, engaged primarily in purchasing and discounting commercial paper, and in making commercial and personal loans. The activities of Industrial Credit Company (herein called "Credit Company") included principally, the financing of installment sales and commercial loans; and it also engaged in years prior to 1953, in handling credit operations and furnishing management services to an insurance company that was then a wholly-owned subsidiary of United Properties, Inc. On the other hand, the principal activity of Industrial Credit Plan, Inc. (herein called *28 "Industrial Plan") was that of making small loans to individuals. Both companies operated out of common offices. However, Industrial Plan had no fixed assets and no operating employees of its own; and its activities were conducted under a management contract with its parent, the Credit Company. Credit Company was incorporated under the laws of the State of Minnesota in March 1933. In April 1944, all its shares of capital stock were acquired by United Properties, Inc.; and this 100 percent controlling stock interest continued until 1952, when certain shares of new participating preferred stock were issued to Credit Company's profitsharing trust. On the material valuation date, the outstanding shares of Credit Company's capital stock were held as follows: United held all the common stock consisting of 2,700 shares, and also all the preferred stock consisting of 5,000 shares; and the above-mentioned profit-sharing trust held all the participating preferred stock consisting of 81 shares. None of the several classes of Credit Company's stock was listed on any stock exchange; and, except when United acquired its stock interest in 1944, no shares of any class were sold or transferred. Credit *29 Company's board of directors during the years 1949 through 1953 consisted of: Petitioner William Hamm, Jr.; said petitioner's above-mentioned brothers-inlaw, Kelley, Ankeny, and Lang; and Credit Company's executive vice president, Fred Mathison. The balance sheet per books of Credit Company, as of December 31, 1953, was as follows: ASSETS
Current Assets
Cash
$ 762,224.77
Notes & accts. receivable -
Retail installment contracts
$ 8,617,204.93
Commercial loans
1,411,139.33
Accounts receivable
26,536.44
Due from subsidiary & affiliated companies on
notes and open accounts
762,520.80
$10,817,401.50
Less -
Reserve for doubtful accounts
$124,211.62
Reserve for unearned discounts
600,763.70
724,975.32
10,092,426.18
Inventories, priced at the lower of cost or market
37,564.39
Prepaid expenses, etc.
52,623.98
Total Current Assets
$10,944,839.32
Investment in Subsidiary Company, at cost
536,539.00
Property & Equipment, at cost
$ 236,224.17
Less - Accumulated depreciation & amortization
77,227.50
$ 158,996.67
Total assets
$11,640,374.99
LIABILITIES AND NET WORTH
Current Liabilities
Notes payable -
Banks
$ 4,800,000.00
Other
564,500.00
Accounts payable
29,264.06
Due to subsidiary and affiliated companies on notes and open
accounts
7,750.00
Accrued expenses
92,258.71
Dealers' reserves & deferred certificates
290,214.99
Federal & state income taxes
120,915.58
Total Current Liabilities
$ 5,904,903.34
Long-term liabilities - due to parent
2,000,000.00
Subordinated notes payable - due May 29, 1960, to parent company
2,000,000.00
Capital Stock and Surplus
Capital stock -
6% noncumulative preferred
$500,000.00
Participating preferred
8,100.00
Common stock
270,000.00
Capital surplus
141,017.90
Earned surplus
816,353.75
Net Worth
1,735,471.65
Total Liabilities and Net Worth
$11,640,374.99
Credit *30 Company's wholly-owned subsidiary, Industrial Plan, was incorporated under the laws of the State of Minnesota in September 1944, which was shortly after the time when United Properties, Inc., acquired all of the capital stock of Credit Company. At all times subsequent to said subsidiary's incorporation, 100 percent of its outstanding shares of capital stock was owned by Credit Company, except for qualifying shares of directors. The stock of Industrial Plan likewise was not listed on any exchange; and none of its shares was ever sold or transferred. The balance sheet per books of Industrial Plan, as of December 31, 1953, was as follows: ASSETS
Current Assets
Cash
$ 126,911.13
Notes & accounts receivable -
Discount installment loans
$1,682,269.53
Accounts receivable
9.99
$1,682,279.52
Less -
Reserve for doubtful accounts
$ 50,468.09
Reserve for unearned discounts
114,394.33
164,862.42
1,517,417.10
Inventories, priced at the lower of cost or market
1,590.00
Prepaid expenses, etc.
492.53
Total Assets
$1,646,410.76
LIABILITIES AND NET WORTH
Current Liabilities
Accounts payable
$ 2,053.81
Due to subsidiary & affiliated companies on notes
& open accounts
756,950.55
Federal & state income taxes
65,902.06
Total Current Liabilities
$ 824,906.42
Capital Stock & Surplus
Common stock
$ 350,000.00
Capital surplus
189,564.00
Earned surplus
281,940.34
Net Worth
821,504.34
Total Liabilities and Net Worth
$1,646,410.76
*31 A consolidated statement for Credit Company and Industrial Plan, showing their consolidated net incomes after income tax, their consolidated earned surplus, and their consolidated net worth per books, for the periods hereinafter indicated, is: Year ending De-
Net income after
Net worth per
cember 31
income tax
Earned Surplus
books *
1949
$114,794.05
$ 323,486.51
$1,583,750.14
1950
141,148.59
464,635.10
1,724,898.73
1951
171,414.88
636,056.08
1,896,319.61
1952
273,923.57
909,979.65
1,347,670.47
1953
188,314.44
1,098,294.09
2,556,975.99
No dividends were paid by Industrial Plan to its parent, Credit Company, during any of the periods from January 1, 1949, through December 31, 1953. And also during these same years, no dividends *32 were paid by Credit Company to its parent, United Properties, Inc. The fair market value, as of the material valuation date, of the controlling stock interest of United Properties, Inc., in both Industrial Credit Company and the latter's wholly-owned subsidiary Industrial Plan, was $1,800,000. [8] Said value is exclusive of the value of the interest of Credit Company's profit-sharing trust, evidenced by the 81 shares of participating preferred stock of Credit Company. Dependable Motors, Inc. , and its subsidiary, North Star Motor Parts, Inc. - These two related companies were, on the material valuation *33 date, engaged principally in selling automobiles, trucks and automotive parts, in the city of Minneapolis. Dependable Motors, Inc. (herein called "Minneapolis Motors") sold Dodge and Plymouth automobiles and trucks, at retail, under a franchise from the Chrysler Corporation. On the other hand, North Star Motor Parts, Inc. (herein called "North Star"), which was a wholly-owned subsidiary of Minneapolis Motors, engaged principally in selling automotive parts, at both wholesale and retail. Both companies operated on the same premises. Minneapolis Motors was organized under the laws of the State of Minnesota in April 1944; and its shares of capital stock were, at all times after its incorporation, held 100 percent by United Properties, Inc. North Star, on the other hand, was organized under the laws of Minnesota on January 23, 1952 (which was slightly less than 2 years before the material valuation date); and at all times subsequent to its incorporation, its shares of capital stock were held 100 percent by Minneapolis Motors. None of the shares of stock of either corporation was listed on any exchange; and none of the shares of stock of either corporation was ever sold or transferred. Minneapolis *34 Motors had profits after income tax for each of the years 1949, 1950 and 1951, in the respective amounts of $90,402.28, $110,386.23, and $39,780.71; and it had an operating loss for each of the years 1952 and 1953 in the amounts of $11,815.05 and $71,408.82, respectively. It paid a dividend to its parent, United Properties, Inc., of $250,000 in 1949; but it paid no dividend in any subsequent year. North Star, on the other hand, had net profits after income tax, for each of the years 1952 and 1953, in the amounts of $20,484.46 and $18,534.26, respectively. It paid no dividend to its parent in any year. Some time prior to October 20, 1953, the board of directors of Minneapolis Motors decided to liquidate its business and dissolve the corporation; and on the last-mentioned date, the company gave formal notice to the Chrysler Corporation that it elected to terminate its dealership agreement, effective January 20, 1954. Thereafter on September 14, 1954, the liquidation of Minneapolis Motors was completed, and its net remaining assets were distributed in liquidation to its parent, United Properties, Inc. However, North Star was not liquidated. The parties hereto have agreed that, as of the *35 material valuation date, the fair market value of all shares of the capital stock of North Star was equal to the amount at which said stock was carried as an investment on the balance sheet per books of Minneapolis Motors, as of December 31, 1953 - which amount was $428,686.41. The parties hereto have agreed also that the fair market value as of the material valuation date of United's stock interest in Minneapolis Motors should be determined on the basis of liquidating value. The balance sheet per books of Minneapolis Motors, as of December 31, 1953, was: ASSETS
Current Assets
Cash
$ 63,314.44
Accounts and notes receivable
(less reserve for doubtful ac-
counts)
79,958.77
Claim for refund of income taxes
6,848.00
Merchandise inventories
93,541.73
Prepaid expenses
12,962.44
Total Current Assets
$256,625.38
Investment in subsidiary North Star,
at cost
428,686.41
Property and equipment, at cost
less depreciation & amortization
$ 50,997.77
Total Assets
$736,309.56
LIABILITIES AND NET WORTH
Current Liabilities
Accounts payable
$ 5,888.12
Accrued expenses
9,128.30
Total Current Liabilities
$ 15,016.42
Net Worth
Common stock
$250,000.00
Earned surplus
471,293.14
Net Worth
721,293.14
Total Liabilities and Net
Worth
$736,309.56 The *36 fair market value as of the material valuation date of the controlling stock interest of United Properties, Inc., in Dependable Motors, Inc. (including the latter's interest in its wholly-owned subsidiary North Star Motor Parts) was $678,500. Dependable Motors of St. Paul, Inc. - This company (herein called "St. Paul Motors") was, on the material valuation date, engaged principally in the retail sale of Dodge and Plymouth automobiles, trucks, and automotive parts, in the city of St. Paul. It operated under a franchise from the Chrysler Corporation. It was organized under the laws of the State of Minnesota in October 1945; and the shares of its capital stock were, at all times after its organization, held 100 percent by United Properties, Inc. None of such shares was listed on any exchange; and none of the same was ever sold or transferred. St. Paul Motors had net profits after income taxes, in each of the years 1949 and 1950, in the amounts of $52,077.69 and $55,573.14, respectively; but for the years 1951, 1952, and 1953, it had operating losses of $8,312.60, $34,496.02, and $65,071.22, respectively. It paid a dividend of $50,000 to its parent, United Properties, Inc., in 1949; but *37 it paid no dividend in any subsequent year. Some time prior to the end of the year 1953 the board of directors of St. Paul Motors decided to liquidate the business and dissolve the corporation; and on March 4, 1954, said company gave formal notice to the Chrysler Corporation of its election to terminate its dealership agreement, effective July 1, 1954. The liquidation of the company continued until August 1, 1955, when the same was completed, and the remaining net assets were then distributed in liquidation to the parent corporation, United Properties, Inc. The parties hereto agree that the fair market value as of the material valuation date of United's stock interest in St. Paul Motors should be determined on the basis of liquidating value. The balance sheet per books of St. Paul Motors as of December 31, 1953, was: ASSETS
Current Assets
Cash, notes and accounts receiv-
able, less reserve for doubtful
accounts
$ 41,512.85
Claim for refund of income taxes
2,698.63
Merchandise inventories at lower
of cost or market (including
new cars at cost of $130,443.46)
242,376.94
Prepaid expenses
8,292.00
Total Current Assets
$295,105.53
Property and equipment, at cost
less depreciation and amortization
30,416.59
Total Assets
$324,522.12
LIABILITIES AND NET WORTH
Current Liabilities
Notes and accounts payable
$154,143.56
Accrued expenses
11,673.92
Total Current Liabilities
$165,817.48
Reserve for Repossession and Serv-
ice
2,614.76
Net Worth
Common stock
$75,000.00
Earned surplus
82,089.88
Total Net Worth
157,089.88
Total Liabilities and Net
Worth
$324,522.12
*38 The fair market value as of the material valuation date, of the controlling stock interest of United Properties, Inc., in Dependable Motors of St. Paul, Inc., was $94,000. Motor Power Equipment Company. - This company (herein called "Motor Power") was, on the material valuation date, engaged principally in distributing and selling electrical household appliances, at wholesale. Its place of business was in St. Paul. It was organized under the laws of the State of Minnesota in 1933, as the successor to a Delaware corporation. All its shares of capital stock were acquired by United Properties, Inc. in April 1944; and at all subsequent times material, United continued to hold 100 percent of such shares. At no time after United acquired its interest in said company were any of Motor Power's shares listed on any exchange; nor were any of such shares ever sold or transferred. Motor Power had net profits after taxes for 1950 of $150,413.99; and it had an operating loss for each of the years 1949, 1951, 1952 and 1953, in the amounts of $13,250.69, $85,550.09, $82,501.29, and $78,694.16, respectively. It paid a dividend to United in 1949 in the amount of $100,000; but it paid no dividend in *39 any subsequent year. Some time prior to the end of the year 1953, Motor Power's board of directors decided to liquidate the business, and dissolve the corporation. The liquidation continued until August 1, 1955, when it was completed; and the remaining net assets were then distributed in liquidation to its parent corporation, United Properties, Inc. The parties hereto agreed that the fair market value as of the material valuation date, of United's stock interest in Motor Power should be determined on the basis of liquidating value. The balance sheet per books of Motor Power as of December 31, 1953, was: ASSETS
Current Assets
Cash and U.S. Bond
$ 34,312.91
Accounts and notes receivable,
less reserve for bad debts
687,028.46
Merchandise inventories, at lower
of cost or market
741,057.36
Total Current Assets
$1,462,398.73
Prepaid expenses
18,687.60
Fixed assets, less depreciation and
amortization
24,765.62
Other assets
27,114.15
Total Assets
$1,532,966.10
LIABILITIES AND NET WORTH
Current Liabilities
Notes and accounts payable
$ 482,769.57
Accrued expenses
43,247.75
Total Current Liabilities
$ 526,017.32
Reserve for service, installation and
demonstration
15,245.97
Net Worth
Common stock
$365,148.13
Capital surplus
21,365.20
Earned surplus
605,189.48
Total Net Worth
991,702.81
Total Liabilities and Net
Worth
$1,532,966.10
*40 The fair market value as of the material valuation date of the controlling stock interest of United Properties, Inc., in Motor Power Equipment Company, was $800,000. Northland Agency, Inc. - This company was, on the material valuation date, engaged in operating an insurance agency in St. Paul. It derived its income from commissions paid by insurance companies on whose behalf it sold policies. It was organized in February 1952, under the laws of Minnesota; and at all times subsequent to its incorporation, all its shares of capital stock were owned and held by United Properties, Inc. None of these shares of stock was ever listed on any exchange; and no shares were ever sold or transferred. The company's gross revenues were $130,654.29 in its first year of operation, and $215,384.48 in the following year 1953; but due to the heavy expenses incurred in getting the business under way, it sustained an operating loss in each of said years. On the material valuation date, there was prospect of profits being earned in subsequent years. The amounts which United Properties, Inc. had invested in the company during 1952 and 1953 were represented by a $25,000 stock investment, and a loan of $50,000 *41 for which it held the company's promissory note. The fair market value as of the material valuation date, of the controlling stock interest of United Properties, Inc., in Northland Agency, Inc. was $25,000. [9]
Bayard Realty Company. - This company, on the material valuation date, was a Minnesota corporation that was organized in 1948. Its business was that of owning and operating one piece of improved real property; and all its income was derived from rentals of that single property. All shares of its capital stock were owned by United Properties, Inc. None of the stock was listed on any exchange; and no shares were ever sold or transferred. The amount of the company's net income after taxes, for the years 1949 through 1953, was approximately $800 per year. It paid no dividend during any year. The Bayard Company's balance sheet per books, as of *42 December 31, 1953, was: ASSETS
Current Assets
Cash
$ 9,026.59
Fixed Assets
Property & Equipment at cost
less depreciation
19,554.90
Total Assets
$28,581.49
LIABILITIES AND NET WORTH
Current Liabilities
Accrued expenses
$ 504.68
Federal & state income taxes pay-
able
97.98
Total Current Liabilities
$ 602.66
Net Worth
Common stock
$24,000.00
Earned surplus
3,987.83
Total Net Worth
27,978.83
Total Liabilities and Net
Worth
$28,581.49
There is no evidence regarding the location, condition, or fair market value of the Bayard Company's improved real estate on the material valuation date; and there also is no evidence as to its leasehold arrangements with tenants. The fair market value, as of the material valuation date, of the controlling stock interest of United Properties, Inc., in Bayard Realty Company was $24,000. [10] Uptown *43 Management Company. - This company, on the material valuation date, was a Minnesota corporation which had been formed in 1943, but which at no time had conducted any active business operation. It had $1,000 of capital stock, all shares of which were owned and held by United Properties, Inc. On the material valuation date, its total assets consisted of cash in the amount of $927.45; and it had no liabilities. The fair market value, as of the material valuation date, of United's controlling stock interest in Uptown Management Company was $900. The aggregate fair market value, as of the material valuation date, of all of United's investments in subsidiary and affiliated companies was $5,322,400. Re: United's Investments in Miscellaneous Stocks and Bonds United held, on the material valuation date, miscellaneous stocks and bonds, of which the identities and fair market values as of said date were as follows: [11]
Fair Market Value
on Material
Valuation Date
No. of
STOCKS
Shares
Per Share
Total
Skelly Oil Co., Common
3,510
$ 35 1/2
$124,605.00
Superior Oil Co., Common
200
650
130,000.00
Truax-Traer Coal Co., Common
2,300
15 5/8
35,937.50
Truax-Traer Coal Co., Preferred
480
42 7/8
20,580.00
$311,122.50
Per Bond
Total
U.S. GOVERNMENT BONDS
Maturity
Fair Market
Number
Due Date
Value
Value
Series F-Rate 2.53%
6
1/1/54
$10,000
$58,800
Series F-Rate 2.53%
1
1/1/54
5,000
4,900
Series F-Rate 2.53%
2
1/1/54
1,000
1,960
Series G-Rate 2.50%
2
6/1/60
10,000
20,000
Series G-Rate 2.50%
1
7/1/54
5,000
5,000
90,660.00
DEBENTURES
Sixth and St. Peter Street Corporation, 20-year 6% debentures
36,666.67
Total Fair Market Value of all above securities
$438,449.17
*44 Re: United's Investments in Oil and Gas Properties United held, as of the material valuation date, certain interests in oil and gas properties. The fair market values of said properties on said date were stipulated to have been, and are hereby found to have been, $368,412.87. Summary of Assets of United Properties, Inc., as of the material valuation date The following table shows: (1) A summary of the assets held by United Properties, Inc., as of the material valuation date, including both the book values and the fair market values thereof; (2) the liabilities to creditors as of said date; (3) the underlying net asset value of United; (4) the amount of the preferred stockholders' equity; and (5) the portion of the underlying *45 assets, at fair market value, attributable to the common stock: Fair Market
ASSETS
Book Value
Value
Current Assets
Cash
$ 1,422,446
$ 1,422,446
Marketable securities
192,353
438,449
Notes and Accounts Receivable - other than stockholders and
related companies
474,534
474,534
Notes receivable - stockholders
500,000
500,000
Fair Market
ASSETS
Book Value
Value
Notes and Open Accounts - affiliated and subsidiary companies
$ 2,708.421
$ 2,708,421
Prepaid expenses
31,148
31,148
Total Current Assets
$ 5,328,902
$ 5,574,998
Investments
Rental real estate (net)
$ 3,484,881
$ 7,836,000
Unimproved real estate
155,917
152,000
Investments in subsidiary companies
2,902,050
5,322,400
Oil and Gas properties (net)
368,413
368,413
Notes, contracts and mortgages receivable
233,396
233,396
Other investments
10,500
10,500
Sinking fund for retirement of mortgage bonds
216,188
216,188
Total Investments
$ 7,371,345
$14,138,897
Property and Equipment (net)
15,570
15,570
TOTAL ASSETS
$12,715,817
$19,729,465
Less: Liabilities to creditors, per books
959,009
Fair market value of underlying net assets
$18,870,456
Less: Equity of preferred stockholders: 35,000 shares 7% cumulative preferred stock, par value $100
per share
$ 3,500,000
Accumulated and unpaid dividends on preferred stock, at
material valuation date
3,685,500
7,185,500
Remaining fair market value of underlying net assets attributable to 1,000
shares of common stock
$11,684,956
Fair market value of underlying net assets attributable to each share of
common stock
$11,684.96
*46 The petitioners, in their Federal gift tax returns for the year 1953, valued the shares of United's common stock which were transferred by gift to Trust No. I and Trust No. II, at $100 per share. The respondent, in his statutory notice of deficiency, determined that the value of said shares of common stock which were so transferred by gift, was $8,506.40 per share. Ultimate Finding The fair market value of the 263 1/3 shares of common capital stock of United Properties, Inc., which were transferred by gift (being a transfer of 130 of said shares to Trust No. I, and a transfer of 133 1/3 of said shares to Trust No. II was, at the time of the gifts, not less than $8,506.40 per share. Issue 1 - Opinion The first issue for decision is the fair market value on the material valuation date in the calendar year 1953, [12] *47 of the shares of common stock of United Properties, Inc., which were at that time transferred by gift to the two trusts here involved. The gift tax provisions of the 1939 Code, which are here applicable, provide in substance and so far as here material, that a gift tax shall be imposed on the transfer by an individual of property by gift; that the tax shall apply whether the transfer is in trust or otherwise; and that in the case of a gift in property, the value of the property at the date of the gift shall be considered the amount of the gift. (Section 1000(a) and (b), and section 1005.) Also, the applicable Treasury Regulations pertaining to the above statutes make it clear that said "value" means the fair market value of each unit of the property, at the time of the gift. Regs. 105, sec. 86.19. The respondent, in his notice of deficiency to petitioner William Hamm, Jr., who made the transfers, determined that the fair market value of said stock at the time of each of the gifts here involved, was $8,506.40 per share; and he then applied such per share value, in computing the total amount of the gift to each trust, the portions of same which were to be attributed to each of the two petitioners pursuant to the elections and consents made in their respective gift tax returns, and *48 the amounts of the deficiencies which he determined in respect of said petitioners. The burden of establishing error in said determination of value (which was not thereafter revised or amended by respondent) was on the petitioners. We think that petitioners have failed to carry such burden. Rather, we have hereinabove found, as an ultimate finding of fact, that the fair market value of the 263 1/3 shares of common capital stock of United Properties, Inc., which were transferred by gift (being a transfer of 130 shares to Trust No. I, and a transfer of 133 1/3 shares to Trust No. II), was at the time of the gifts, not less than $8,506.40 per share. We have, in making said ultimate finding as to value, carefully considered all the evidence pertaining to the present issue, including the stipulations of fact, the testimony of all witnesses presented by each of the parties, and the numerous exhibits received in evidence which included areamaps, corporate records, financial statements and other data pertaining to the problem before us. We also have analyzed all said evidence, and given due weight to each item or portion thereof. Most of the facts established by the evidence have hereinabove *49 been set forth in considerable detail in our Findings of Fact; and, while we believe that no useful purpose would be served by making an extended review of the same here, we state that among the factors or elements of value to which we have given consideration, are the following: The organization and history of United Properties, Inc.; its capital structure, the nature of its business, and the manner in which such business was operated; the number of outstanding shares of each class of the company's capital stock, and the identity of the shareholders; the number of shares transferred in making each of the gifts here involved; the fact that United's shares were not listed on any exchange, were not dealt in through brokers or in over-the-counter trading, and had not been the subject of any sales; the character and amounts of United's assets and liabilities; the fair market value of its underlying assets; the amounts and trends of its annual earnings, and the prospects for future earnings; its dividend paying history, and the prospects for future dividend payments; and all other factors which, in our view or that of the witnesses, tend to have an effect on the value of the shares of stock *50 here involved, on the material valuation date. In weighing the opinions of value expressed by the several expert witnesses, we considered as to each witness: His qualifications and demeanor; his demonstrated familiarity with the particular property and with the factors which affected its value; in the case of real estate items, his familiarity with the area, and with sales transactions regarding comparable properties; the soundness of the valuation method he employed; and his demonstrated skill in assembling, analyzing and weighing his supporting data. One of the factors or group of factors to which we have given especial consideration is the character of United's investment portfolio, the purpose for which particular items of such investments were held, and the extent to which the earnings on such investments (particularly the earnings of the wholly-owned subsidiary corporations) were permitted to flow, or not to flow, into the current earnings and profits of United Properties, Inc. This corporation was, on the material valuation date, a family-owned investmentholding company. It was organized in 1937 for the purpose of having it take over and hold certain real estate and other investments, *51 which had theretofore been held by the Theo. Hamm Brewing Company. All its shares of both common and preferred stock had at that time been issued to petitioner William Hamm, Jr., and his three sisters Margaret, Theodora and Marie, in the ratio (for both common and preferred stock) of two-fifths to petitioner and one-fifth to each of the sisters. Thereafter, at all times prior to the material valuation date, the principal equity interests in the company's capital stock were held in substantially the same proportions, by groups consisting of these same persons, their children, and trusts which they respectively had created. In about 1943, as we have hereinabove found, United began to expand and diversify its investments with funds then on hand, by either incorporating wholly-owned subsidiaries or by acquiring substantially all the outstanding shares of stock of existing corporations, for the purpose of having such companies engage in various business enterprises with a view to profit; and as shown in our Findings of Fact, 10 of such controlled companies were existent on the material valuation date. Yet - although several of these companies had substantial annual earnings, large amounts *52 of accumulated earned surplus, and large amounts of net current assets - they were so operated that none of them declared or paid any dividends after 1949, and some of them had never declared or paid any dividend. The two most significant examples of this situation are the following: 1953 net earn-
Earned sur-
Net current
Dividends
ing after
plus as of
assets as of
paid after
income tax
12/31/53
12/31/53
7/1/49
The Emporium of St. Paul, Inc.
$206,316
$1,703,523
$2,685.846
No dividend
on either class
of stock
Industrial Credit Company and its
188,314
1,098,294
5,861,440
No dividend
subsidiary, Industrial Credit Plan
paid by either
company The result of such method of United's operation was, that the earnings and profits of these subsidiary and affiliated companies, did not flow into United's own earnings, but were "dammed-up" at their source. Hence any attempt to determine the value of United's stock, solely by reference to its record of annual earnings, would fail to reflect the substantial equities represented by its investments in these subsidiary and affiliated companies. As regards the investments in real estate, the evidence discloses that United held either title or long-term leases for 68 parcels, including *53 both improved and unimproved properties located in or near St. Paul, and miscellaneous properties located in other Minnesota cities, in Wisconsin, in Montana, and in Canada. The buildings on some of the properties in the St. Paul area were in bad physical condition, did not reflect the highest and best use of the properties, and produced little more income than was required for payment of taxes and other carrying charges; indeed we have found that some of these properties represented liabilities rather than productive assets, on the material valuation date. Yet, many of these properties had been held by United for long periods of years, without indication of any efforts to dispose of the same - thereby raising a reasonable inference that they were not being held primarily for production of current earnings and profits, but rather with a view to some other objective, such as future improvement, long range appreciation, or as a hedge against inflation. Thus, here likewise, a determination of the value of United's common stock based solely on consideration of its current earnings, would fail to give adequate effect to that equity interest in such stock which is represented by many of *54 its real properties. Moreover, most of the investments of United (including those above mentioned, and also its Government bonds, its stocks and debentures in uncontrolled companies, and its interests in oil and gas properties) are unrelated one to another, both as to capital investment and as to the income therefrom. Hence, they are unlike the plant, machinery and equipment of a manufacturing corporation, for example, where the separate items may have little value apart from their ability to produce profits when operated as an integrated and interrelated unit - thereby making it necessary to value the stock of the manufacturing company by reference to the earnings produced through the operation of its plant as a whole. The foregoing has caused us to conclude that United's earnings, considered alone, do not furnish a reliable criteria of the value of the shares of stock here involved. See Estate of Henry E. Huntington, 36 B.T.A. 698, 714, appeal dismissed (C.A. 9) 94 F. 2d 1019. See also as to administrative practice, Rev. Rul. 59-60, 1959-1 C.B. 237, 242-243. While such earnings are of course a factor for consideration, we must also give consideration to the fair market value *55 of the underlying assets, and to all other elements and factors of value. Thus, in making our ultimate finding of fact as to the value of United's common stock at the time of the gifts here involved, we have relied, not solely on that company's earnings, nor have we relied solely on the underlying asset values, but rather we have considered all factors disclosed by the evidence, which in our view have a bearing on the value. And we have considered also the testimony of all the expert witnesses presented by each of the parties. By the process of thus considering and weighing all the evidence in the light of our experience and judgment, we have hereinabove found as an ultimate fact, and we here hold, that the fair market value of United's common stock on the material valuation date was not less than $8,506.40 per share; and we further hold that the petitioners have failed to establish error in respondent's determination of value. We decide this first issue in favor of the respondent. II. Issue 2 - Findings of Fact All pertinent Findings of Fact hereinbefore made are, with a view to minimizing repetition, incorporated herein by reference. The declaration of trust for Trust No. I provided, *56 in part and so far as is here material, as follows: ARTICLE I The trustee's duties with respect to the disposition of the trust fund or corpus shall be: (a) To hold, manage, invest, and reinvest the same and to collect and to receive the income therefrom during the term of this trust. (b) To take possession of, manage, and control the same; demand, collect, and receive the income, profits, and dividends thereon; pay the expense of administering the trust and of maintaining and protecting the trust estate; pay all taxes, imposts, levies, assessments and charges that may properly be payable by the trustee or trust estate; invest and reinvest the trust estate; and apply, pay, and distribute the principal and income thereof as herein provided. (c) From the date of the creation of this trust until the 1st day of March, 1964, the trust (including property now a part hereof or hereafter conveyed to this trust) shall be for the exclusive use and benefit of The Hamm Foundation, Inc., a charitable organization created under and by virtue of the laws of the State of Minnesota, and during such period of time all the income from the trust shall belong absolutely to the said Foundation. The trustee *57 shall pay over, in quarterly installments, to said Foundation all of the annual income from the corpus of this trust. (d) From and after the 1st day of March 1964, all of the net annual income of this trust shall be accumulated year by year and on the 1st day of January, 1970, or within a reasonable time thereafter, all of said accumulation and all of the corpus of this trust shall be distributed, free from all trusts, to my son Edward Hersey Hamm, should he then be living. (e) Should my said son, Edward Hersey Hamm, die prior to the termination of this trust, leaving issue him surviving, the accumulated income and any part of the corpus of said trust estate to which the said Edward Hersey Hamm would have been entitled had he lived shall be distributed at the termination date of this trust in equal shares to his issue by right of representation. If he shall die without issue him surviving, his entire interest in the trust estate shall be paid in equal shares to his brothers and sisters of the full blood surviving him, and to the issue then surviving of any deceased brother or sister, such issue to take by right of representation the share which the deceased brother or sister would *58 have taken if living. If Edward Hersey Hamm and his brothers and sisters of the full blood all die without issue surviving to take the trust estate, the property of the trust estate shall be distributed, in equal shares, at the termination date of this trust, to the then surviving issue of any marriage of the settlor's sisters, Margaret H. Kelley, Marie Josephine Ankeny and Theodora Lang. If there be no beneficiaries as above defined to take distribution, then the entire trust estate shall be distributed at the termination date of this trust to The Hamm Foundation, Inc., a charitable organization. * * *
ARTICLE V [This Article granted broad powers to the trustee with respect to the administration of the trust, including the following power:] (e) To determine what is "income" and what is "principal" of the trust estate, and his decision thereon shall be final; provided, however, that: * * * (4) Any stock dividends or subscription rights which may be declared upon or issued in connection with any stock constituting a portion of the trust estate shall be considered as principal and not as income; (5) Capital gains and losses shall be allocated to principal. * * *
ARTICLE VI At any time *59 hereafter the trustee named herein may resign the office of trustee under the trust herein established. Upon such resignation becoming effective or whenever there shall be a vacancy in the office of trustee, and not otherwise, the settlor by a written instrument may appoint as trustee either a trust company or an individual, or both, as trustee or trustees even though the appointees are residents of another state. * * * In the absence of contrary appointment by the settlor hereof, the Northwestern National Bank of Minneapolis is hereby nominated and appointed as successor trustee to the settlor in the office of trustee, to hold such office during any or all times when there may be a vacancy in the office of trustee, provided, however, that if when my son, William Hersey Hamm, shall attain the age of twenty-two (22) years the settlor is not the trustee hereof, my said son shall then become the trustee of the trust. When my son, Edward Hersey Hamm, attains the age of twenty-two (22) years, provided the settlor is not the trustee hereof, he shall become the trustee of this trust, replacing whosoever may be the trustee. Notwithstanding the foregoing provisions, should Edward Hersey Hamm *60 resign as trustee or for any reason be unable to act after reaching the age of twenty-two (22) years, then William Hersey Hamm is hereby nominated and appointed as successor trustee. The settlor reserves the right to remove any trustee and to appoint a successor to fill the vacancy thereby created, but the settlor shall have no right to amend or otherwise alter or change the conditions of this trust, or the beneficiaries thereof, or their respective shares or rights hereunder. As regards the declaration of trust for Trust No. II, all provisions thereof were identical with the corresponding provisions for Trust No. I, except as follows: (A) In Article I, paragraphs (d) and (e) of the declaration of Trust No. II (pertaining to individual beneficiaries), the name of the settlor's son, William Hersey Hamm, is set forth in lieu of that of petitioner's other son, Edward Hersey Hamm, at all four places where the latter's name appears in the above-quoted corresponding provisions of Article I of the declaration for Trust No. I. (B) In Article VI, second paragraph, of the declaration for Trust No. II (pertaining to the appointment of successor trustees), it is provided in substance that, if *61 when the settlor's son William Hersey Hamm (the first named individual beneficiary) shall attain the age of 22 years the settlor is not the trustee of the trust, then said son shall become the trustee of the trust. There is no provision corresponding to the second sentence of the declaration for Trust No. I relating to the replacement of Edward by William. Also, in the third sentence of said paragraph, the name of Edward is set forth in lieu of that of William. At the time of the gifts of corporate stock here involved, the following members of the Hamm family were living: Name and relationship to one another
Date of birth
William Hamm, Jr., petitioner
September 4, 1893
Marie Hersey Hamm, spouse of William Hamm, Jr.
November 25, 1898
Edward Hersey Hamm, son of William Hamm, Jr.
July 23, 1937
William Hersey Hamm, son of William Hamm, Jr.
March 8, 1935
Margaret H. Kelley, sister of William Hamm, Jr.
August 9, 1898
James E. Kelley, spouse of Margaret H. Kelley
December 3, 1895
Cynthia Kelley O'Neill, daughter of Margaret H. Kelley
September 7, 1929
James C. O'Neill, son-in-law of Margaret H. Kelley
January 2, 1929
Theodora H. Lang, sister of William Hamm, Jr.
November 5, 1903
William H. Lang, spouse of Theodora H. Lang
May 12, 1900
Barbara Lang Cockrane, daughter of Theodora H. Lang
July 1, 1930
William H. Lang, Jr., son of Theodora H. Lang
May 22, 1926
Albert Sheffer Lang, son of Theodora H. Lang
December 23, 1927
Marie H. Ankeny, sister of William Hamm, Jr.
November 5, 1903
DeWalt H. Ankeny, spouse of Marie H. Ankeny
August 1, 1899
Kendall Ankeny Mix, daughter of Marie H. Ankeny
July 21, 1927
Phoebe Mix, granddaughter of Marie H. Ankeny
June 22, 1950
Peter Mix, grandson of Marie H. Ankeny
March 24, 1952
Robin Mix, Jr., grandson of Marie H. Ankeny
December 29, 1953
Sally Anson, daughter of Marie H. Ankeny
January 1, 1931
DeWalt H. Ankeny, Jr., son of Marie H. Ankeny
December 29, 1932
Michael Hamm Ankeny, son of Marie H. Ankeny
May 29, 1940
*62 Also, subsequent to the date of the gifts here involved and prior to the execution of the stipulation of facts which was filed herein on May 23, 1960, there were born at least two other members of the Hamm family, to wit: Date of birth James Warner O'Neill, grandson of Margaret H. Kelley April 11, 1954 Donald Ankeny, grandson of Marie H. Ankeny May 25, 1956 At the time of the gifts here involved, The Hamm Foundation, Inc., which is mentioned in the declarations for Trust No. I and Trust No. II, was a charitable foundation of the type specified in section 1004(a)(2)(B) of the 1939 Code. The directors of said charitable foundation, on and subsequent to December 31, 1953, were: William Hamm, Jr., petitioner Margaret H. Kelley, sister of William Hamm, Jr. Theodora Lang, sister of William Hamm, Jr. Marie H. Ankeny, sister of William Hamm, Jr. Marie H. Hamm, spouse of William Hamm, Jr. DeWalt H. Ankeny, spouse of Marie H. Ankeny William H. Lang, spouse of Theodora Lang James E. Kelley, spouse of Margaret H. Kelley Cynthia Kelley O'Neill, daughter of Margaret H. Kelley Kendall Mix, daughter of Marie H. Ankeny William H. Lang, Jr., son of Theodora H. Lang Joseph A. Maun, attorney for petitioners *63 and certain Hamm family business interests Petitioner William Hamm, Jr., has occupied the position of, and acted as, the sole trustee of Trust No. I and also as the sole trustee of Trust No. II, at all times since said trusts were created. On or about August 26, 1953, which was prior to the gifts of corporate stock here involved, Trust No. I and Trust No. II each exchanged $40,000 cash (which cash had been transferred by gift to each trust by petitioner William Hamm, Jr., on July 18, 1953; and which constituted all the then corpus of each of said trusts) for shares of stock of the Theo. Hamm Brewing Company, a California corporation; and this stock was thereafter exchanged for shares of stock of the Theo. Hamm Brewing Company, a Minnesota corporation. At no time prior to the filing of the stipulations of fact herein on May 23, 1960, did the corpus of either Trust No. I or Trust No. II produce any net income available for distribution to The Hamm Foundation. United Properties, Inc., the shares of common stock of which were the subject of the gifts here involved, was organized under the laws of the State of Minnesota on December 30, 1937, by shareholders of Theo. Hamm Brewing Company, *64 for the purpose of having it hold certain real estate and other investments theretofore held by said Brewing Company. At the time of its incorporation, all shares of both its common and preferred stock were issued to petitioner William Hamm, Jr., and his three sisters (Margaret Hamm Kelley, Theodora Hamm Lang and Marie Josephine Hamm Ankeny), in the proportions of two-fifths to said petitioner and one-fifth to each of said sisters. Also, at all subsequent times to and including the date of the gifts here involved, no shares of the capital stock of said corporation, of either class, were transferred to anyone, other than individuals or trustees who were members of the respective families of said original shareholders. And immediately prior to the gifts here involved, all shares of both classes of the capital stock of United were held in the same ratio of two-fifths, one-fifth, one-fifth and one-fifth, by members of four groups, each consisting of the original shareholder or members of his or her family or a trustee or trustees of trusts created by such original shareholder. The directors of United Properties, Inc., during the calendar years 1949 through 1953, were: Petitioner William *65 Hamm, Jr.; the husband of petitioner's sister Margaret; the husband of petitioner's sister Marie; and Joseph Maun, attorney for the petitioners and certain of the Hamm family business interests. No dividend was declared or paid by United on its shares of preferred stock at any time subsequent to November 30, 1941; and at the time of the gifts here involved, the amount of delinquent, accumulated and unpaid dividends on United's preferred stock was $3,685,500. No dividend has ever been declared or paid by United on its shares of common stock since its incorporation on December 30, 1937. And, under the provisions of United's articles of incorporation, no dividend may be declared or paid on its common stock, (1) in case the capital stock would become impaired, or (2) until all dividends upon the preferred stock, including all delinquent, accumulated and unpaid dividends thereon, shall first have been paid, or (3) other than from undistributed profits. Under section 301.37 of the Minnesota Statutes (Minnesota Business Corporation Act, 20 Minn. Stat. Anno. sec. 301) in force and effect at the time of the gifts here involved, no amendment of United's articles of incorporation could be made *66 which would adversely affect the rights of the holders of its shares of any class, unless such shareholders voted favorably as a class upon such amendment. Petitioners stated in their principal brief herein at page 55: D. By Virtue of Annual Dividend Requirements and Accumulated Arrearages on the Preferred Stock of United as of December 31, 1953, and by Virtue of the Cash Requirements of United there were no Earnings Available for the Common Stock of United, [and] no Dividends Foreseeable on its Common Stock for Many Years. * * * Each of the petitioners, in his or her pleadings (Reply to Amended Answer) filed herein, made the following admission of fact: D. Admits that Trusts numbers I and II have not realized current income as of the close of the year 1958 [being 5 years after the making of the gifts here involved] and have not transferred property to the charitable beneficiary. * * * [Ultimate Finding] At the time of the gifts of common stock here involved, there was no reasonable probability, and no expectation by either of the petitioners, that any dividend would be declared or paid by United Properties, Inc. on its common stock, at any foreseeable time in the future. At the *67 time of the gifts of common stock here involved, there was no probability, and no expectation by either of the petitioners, that Trust No. I or Trust No. II would, at any foreseeable time in the future, derive any income from the shares of stock composing said gifts, which would make it possible for either of said trusts to distribute any net income therefrom to The Hamm Foundation. At the time of the gifts of common stock here involved, the income interests given to The Hamm Foundation as part of each of said gifts, were not susceptible of valuation. Issue 2 - Opinion The second issue for decision is whether, in computing the net gifts of each of the petitioners for the calendar year 1953, any amounts are allowable to said petitioners in respect of the transfers of common stock here involved, for: (1) Exclusions from said gifts, under section 1003(b)(3) of the 1939 Code; or (2) deductions for charitable gifts, under section 1004(a)(2)(B) of said Code. [13] *68 *69 1. In considering the foregoing issue, it should be noted at the outset that there are certain general principles to be applied. First, where a gift is made by transfer in trust and more than one person has a beneficial interest in such trust, the transfer is to be regarded, not as having effected a single gift to the trustee, but rather as having effected separate gifts to the several beneficiaries. Helvering v. Hutchings, 312 U.S. 393. Thus, exclusions and charitable deductions may be allowable in respect of one or more beneficiaries, but not in respect of other beneficiaries. Second, the allowability of a deduction for a charitable gift, irrespective of whether it is an inter vivos gift or a testamentary gift, must be determined with reference to the facts and circumstances existing at the time of the gift. Ithaca Trust Co. v. United States, 279 U.S. 151. Third, the gift tax was supplementary to the estate tax; and the provisions of the gift tax statute and those of the estate tax statute are in pari materia, and must be construed together. Estate of Sanford v. Commissioner, 308 U.S. 39, 44. Thus judicial authorities and administrative practice pertaining to the adequacy *70 of charitable gifts within the ambit of one statute may be considered in connection with charitable gifts falling within the ambit of the other. 2. The purpose of Congress in providing deductions for charitable gifts was to encourage gifts for charitable purposes; and in order to make such purpose effective, there must be a reasonable probability that the charity actually will receive the use and benefit of the gift, for which the deduction is claimed. In Commissioner v. Sternberger's Estate, 348 U.S. 187, the Supreme Court, in dealing with a charitable testamentary gift as to which the provisions of the Estate Tax Regulations are more explicit than are the corresponding provisions of the Gift Tax Regulations, said. The predecessor of § 81.46 [of the Estate Tax Regulations under the 1939 Code] confined charitable deductions to outright, unconditional bequests to charity. It expressly excluded deductions for charitable bequests that were subject to conditions, either precedent or subsequent. While it encouraged assured bequests to charity, it offered no deductions for bequests that might never reach charity. Subsequent amendments have clarified and not changed that principle. Section *71 81.46(a) today yields to no condition unless the possibility that charity will not take is "negligible" or "highly improbable." [14] *72 In several cases arising under the gift tax or estate tax laws, charitable gifts of trust income or trust corpus have been denied deduction, where the courts have found it to be uncertain that the charity will receive anything. Such uncertainties have arisen in various ways. In Martha F. Mason, 46 B.T.A. 682, the trust instrument provided that the net income of the trust should be paid to a charity for the life of the settlor, but the corpus of the trust consisted of insurance policies that might or might not generate any income. We held that, in such circumstance, no charitable deduction was allowable. In Commissioner v. Sternberger's Estate, supra, the Supreme Court denied deduction for a remainder to charity, which *73 was contingent upon a life tenant of 27 years of age dying without issue surviving her. The reason for such denial was that there was no reliable method for determining whether the contingency would occur, so as to permit the charity to take anything. The Court explained its holding, in part as follows: This Court finds no statutory authority for the deduction from a gross estate of any percentage of a conditional bequest to charity where there is no assurance that charity will receive the bequest or some determinable part of it. Where the amount of a bequest to charity has not been determinable, the deduction properly has been denied. To the same effect see Humes v. United States, 276 U.S. 487. Likewise, in Norris v. Commissioner, (C.A. 7) 134 F. 2d 796, certiorari denied 320 U.S. 813, affirming 46 B.T.A. 705, the Seventh Circuit denied a charitable deduction to a decedent's estate, on the principal ground that the testamentary trustees had sole and absolute "discretion and option" to name the charities which would receive funds, and the amount which each charity would receive. Similarly, in First Trust Co. of St. Paul v. Reynolds, 137 F. 2d 518, the Court of Appeals for the *74 Eighth Circuit denied deduction for a specific bequest to charity where the decedent's will contained a provision that such bequest was to become effective only if his surviving spouse gave her consent thereto in writing.[15] 3. Turning now to the instant case, we think the conclusion is inescapable that, when all the facts and circumstances surrounding the gifts of common stock here involved *75 are considered in the light of the principles established by the foregoing statutes, judicial authorities, and administrative practices, no charitable deductions in respect of said gifts of common stock are allowable for the 10-year income interests given to The Hamm Foundation. The only income which the trusts could realize from the shares of common stock of United, which were the subject of said gifts, would be from dividends on such stock. And, as hereinbefore found, the petitioners state in their brief, that "there were no Dividends Foreseeable on its [United's] Common Stock for Many Years." That admission is fully supported by the record herein. Dividends on United's common stock were dependent upon precedent changes in United's dividend policies, for: First, a decision would have to be made by United's directors to pay off the delinquent, accumulated and unpaid dividends of $3,685,500 on United's preferred stock; and then a further decision would have to be made by them to pay dividends on United's common stock (assuming continued availability of earnings for this purpose). There is no way to forecast the likelihood of the occurrence of these two contingencies. Indeed, all indications *76 in this record tend to negative the likelihood that such actions would occur. United had never paid a dividend on its common stock in its entire 16-year history; and as before stated, the petitioners could see no probability that dividends on such stock would be paid at any foreseeable time in the future. Also up until December 31, 1958, which was the end of approximately the first half of the 10-year period during which the charity had an income interest, no such dividend had been paid. Certainly, some precedent discretionary action would have had to be taken by United's directors or by the trustee-stockholders before any benefit from either of the gifts would ever reach charity. As regards the possible residuary interest of The Hamm Foundation in each of the gifts, what we have said above as to the improbability of any income interest in the gifts becoming available to charity, applies also to this residuary interest. Both the corpus and all accumulated income of each trust was to vest in one of the donor's sons or other members of the Hamm family on January 1, 1970; and, in order for the Foundation's residuary interest to take effect, at least 13 members of that family who were *77 living on the date of the gifts and whose ages ranged from 1 to 27 years, would all have to die without surviving issue, before said date of January 1, 1970. The fulfillment of such precedent condition is extremely improbable; and the value of The Hamm Foundation's remainder interest is not susceptible of valuation. Hence, because at the time of the gifts, there was uncertainty and improbability that anything would ever reach charity, and also because we find it to be impossible to value any of The Hamm Foundation's beneficial interests in either of the gifts of common stock here involved, we hold that no charitable deduction is allowable to either of the petitioners with respect to said gifts of common stock. [16] *78 *79 4. As regards exclusions from gifts under section 1003(b)(3) of the 1939 Code, we hold that neither of the petitioners is entitled to any exclusion with respect to the gifts of United's common stock here involved. No exclusion is allowable for the 10-year income interests of The Hamm Foundation, because as we have hereinabove found and held, both the probability of United declaring and paying dividends on its common stock, and also the probability of The Hamm Foundation deriving any net income from the trusts as the result of such dividends being paid, are too uncertain to be susceptible of valuation. Andrew Geller, 9 T.C. 484, 494-495. See also Heringer v. Commissioner, (C.A. 9) 235 F. 2d 149, certiorari denied 352 U.S. 927. As regards the remainder interests of the petitioners' sons and other members of the Hamm family, these obviously are all "future interests"; and, under the express provisions of section 1003(b)(3), no exclusions are allowable for future interests. Since each of the petitioners made other gifts during the calendar *80 year 1953, Decisions will be entered under Rule 50. Footnotes
*. Approximately $1,000,000 of United's cash on hand at December 31, 1953, represented the amount of a cash liquidating dividend received on December 28, 1953, from one of United's then wholly-owned subsidiaries, General Truck & Equipment Company.↩
1. These profit and loss statements were stipulated by the parties. Although United actually kept its books of account on a fiscal year basis, the results of operations as shown on the following profit and loss statements are, by agreement of the parties, reflected on a calendar year basis.
*. As of January 1, 1938, United had capital surplus of $3,332,192.12 the amount of income after taxes for said year, such dividend was necessarily paid in principal part from said capital surplus. ↩
**. This represents an 8-month period.↩
2. The item numbers herein mentioned are those used by United in its property accounts. These numbers also were employed by the parties on maps and other exhibits, and by certain witnesses in their testimony.↩
3. The value so found is based principally upon the testimony of respondent's witness William H. Muske; and it is $55,000 less than the value which petitioners, on brief, requested us to find on the basis of the testimony of their witness, Walker. We have concluded that we should not regard said request of petitioners to be an admission against interest; and accordingly we have made our finding as to the fair market value, from a consideration and weighing of all the pertinent evidence, including the opinion testimony of the witnesses for both parties.↩
4. We have based our finding of fair market value principally on the opinion testimony of witness William H. Muske. He supported such opinion with an extensive analysis, in which he concluded among other things: That the rentals which United had been receiving from its subsidiary corporation were less than the fair rental value of the property; and that such rentals also were less than those which could reasonably be expected to be received under a new arm's length rental arrangement to be made on August 1, 1954, following the expiration of the existing lease. Petitioners' witness Clifford Walker testified, on the other hand, that in his opinion the value of United's interest was $1,200,000, which he determined principally through capitalizing the amounts of the existing rentals. We have concluded, after observing both witnesses and analyzing their testimony, that the opinion of value expressed by witness Muske is supported by a more thorough analysis, and is more reliable.↩
*. It was the opinion of witness Muske that the leaseholds on these two starred properties represented a liability rather than an asset, because of the disproportion between the amounts of the ground rents and the rentals which could reasonably be expected from the existing improvements; and because it would be necessary for United to pay a purchaser the amounts indicated in parentheses, in order to motivate sales of such leaseholds.↩
5. In making our finding of fair market value, we have placed principal reliance on the opinion testimony of witness Muske, in preference of that of witness Walker, for the reasons: That Muske demonstrated greater familiarity with the particular properties involved, and superior knowledge of market values in the St. Paul area; and also that his analysis of values was, in our opinion, more thorough and reliable.↩
6. This policy to expand and diversify investments is referred to in a resolution adopted at a meeting of United's board of directors on July 7, 1943. At that meeting, consideration was given to the purchase of the malt plant of the Theo. Hamm Brewing Company, together with the equipment therein (property which was not included in United's investments on the material valuation date). In the preamble to said resolution, which was adopted by a motion of Marie Josephine Ankeny and seconded by Margaret Louise Kelley, it was stated: * * * The Board of Directors of this corporation prefers that there be a diversification of the company's investments; and * * * It appears that the company has on hand sufficient funds with which to purchase additional property or businesses; * * *
*. 5-month period.↩
7. The petitioners contended on brief that the fair market value of United's interest in the Emporium Company on the material valuation date was $1,150,000, based on the opinion testimony of their witness Walker; whereas the respondent contended that said fair market value was $2,850,000, based on the opinion testimony of his witness Gilfillan. In making our above finding as to the fair market value, we have considered and weighed all of the pertinent evidence, including that pertaining to the company's earnings, its current assets, all its other assets and liabilities, and including the opinion evidence of all witnesses. In addition, we have given consideration to the fact that the company probably would have to pay higher rental after the expiration of its existing lease on July 31, 1954.↩
*. As regards Industrial Plan, its net worth per books was equal to its net current assets, for it had no liabilities other than current liabilities. As regards Credit Company, its only liabilities other than current liabilities, consisted of loans from its parent company, United Properties, Inc. The amounts of such loans from its parent company were: $500,000 as of the end of each of the years 1950 and 1951; $1,500,000 as of the end of the year 1952; and $4,000,000 as of the end of the year 1953.↩
8. Petitioners contended that the fair market value on the material valuation date of United's interest in Industrial Credit Company and in Industrial Credit Plan, considered on a consolidated basis, was $1,750,000. Respondent contended, on the other hand, that the fair market values on the material valuation date of United's stock interest in Industrial Credit Company and of the latter's stock interest in its wholly-owned subsidiary, Industrial Credit Plan, considered on a nonconsolidated basis, were $1,400,000 and $800,000, respectively - reflecting a total for both companies of $2,200,000.↩
9. At the trial, three witnesses gave opinion testimony as to the fair market value of United's interest in Northland Agency, Inc., as of the material valuation date: The opinion of value expressed by petitioners' witness Walker was $25,000; that of petitioners' witness Berends was $64,615; and that of respondent's witness Gilfillan was $25,000.↩
10. At the trial, three witnesses gave opinion testimony as to the fair market value on the material valuation date, of the shares of capital stock of Bayard Realty Company which were held by United Properties, Inc. The opinion of value expressed by petitioners' witness Walker was $28,000; that of petitioners' witness Berends was $28,581.49; and that of respondent's witness Gilfillan was $24,000.↩
11. It has been stipulated that, as regards the stocks above mentioned, the fair market values per share thereof on the material valuation date were those shown in the following table, which were determined by a St. Paul brokerage house. It has been further stipulated that, as regards the bonds above mentioned, the fair market values thereof on the material valuation date were approximately the costs thereof per United's books - which costs are those hereinafter shown.↩
12. We have hereinbefore found as a fact and held, that said material valuation date was December 30, 1953. This date is that which the petitioners represented on their gift tax returns to have been the specific date in the calendar year 1953 when the gifts actually were made.
13. Internal Revenue Code of 1939. SEC. 1003. NET GIFTS. (a) General Definition. - The term "net gifts" means the total amount of gifts made during the calendar year, less the deductions provided in section 1004. (b) Exclusions from Gifts. - * * *
(3) Gifts after 1942. - In the case of gifts (other than gifts of future interests in property), made to any person by the donor during the calendar year 1943 and subsequent calendar years, the first $3,000 of such gifts to such person shall not, for the purposes of subsection (a), be included in the total amounts of gifts made during such year. SEC. 1004. DEDUCTIONS. * * *
In computing net gifts for the calendar year 1943 and subsequent calendar years, there shall be allowed as deductions: (a) Residents. - In the case of a citizen or resident - (1) Specific Exemption. - * * * (2) Charitable, Etc., Gifts. - The amount of all gifts made during such year to or for the use of - * * *
(B) a corporation, or trust, or community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals;. no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. * * *
14. In this connection, it is to be observed that both in the Estate Tax Regulations and in the Gift Tax Regulations issued under the 1954 Code, which are not here involved, this same principle has been made even more explicit; and also an example has been inserted which bears a marked resemblance to the instant case. Said Gift Tax Regulations provide in part as follows: § 25.2522(a)-2. Transfers not exclusively for charitable, etc., purposes - * * * (b) Transfer subject to a condition or a power. If, as of the date of the gift, a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible. * * * The deduction is not allowed in the case of a transfer in trust conveying to charity a present interest in income if by reason of all the conditions and circumstances surrounding the transfer it appears that the charity may not receive the beneficial enjoyment of the interest. For example, assume that assets placed in trust by the donor consist of stock in a corporation, the fiscal policies of which are controlled by the donor and his family, that the trustees and remaindermen are likewise members of the donor's family, and that the governing instrument contains no adequate guarantee of the requisite income to the charitable organization. Under such circumstances, no deduction will be allowed. * * *
15. Analogous cases, which do not involve charitable deductions, are those which present the question as to whether the amount of a donor's gift should be reduced by the amount of his reserved income or reversionary interest, where there is uncertainty as to whether such reserved interest will ever yield any benefit. See Robinette v. Helvering, 318 U.S. 184, (amount of gift held not reduced by a reversionary interest dependent upon a contingency, the occurrence of which it was impossible to forecast). See also Herzog v. Commissioner, (C.A. 2) 116 F. 2d 591, affirming 41 B.T.A. 509, and Minnie E. Deal, 29 T.C. 730↩ (both denying a reduction from total gifts because of the donors' retained income interests, where the trustees had sole discretion as to what amounts would be paid over to the donors).
16. It would not be proper in our opinion, in the circumstances of the instant case, to value the 10-year income interest of The Hamm Foundation through use of the table contained in the respondent's Gift Tax Regulations, which is provided for use in valuing certain estates for life or for terms of years. In the instant case, as above shown, there was no probability that charity would ever take anything; and hence it would be wholly unrealistic to apply the table here. Said table assumes an annual yield of 3 1/2 percent; but in the instant case, any yield whatsoever on United's common stock was wholly improbable, and likely to be nil. See, in this connection, Martha F. Mason, 46 B.T.A. 682, 687; Willis D. Wood, 16 T.C. 962, 967; and Minnie E. Deal, 29 T.C. 730, 735. This Court has held that where the probable yield is either significantly greater, or significantly less than the yield assumed in the table, then regard should be had to the actualities of the particular case, rather than to the assumption built into the table. Huntington National Bank, 13 T.C. 760, 769-771; and Security-First National Bank of Los Angeles, Executor, 35 B.T.A. 815, 822. See also Hanley v. United States, (Ct. Cls.) 63 F. Supp. 73. Moreover, tables of such character are provided only by the regulations. And in the regulations for the estate tax (which we have held to be in pari materia with the gift tax), the provisions which relate to use of the table, are followed by a further provision (Sec. 81.46, Regs. 105) that "no [charitable] deduction is allowable unless the possibility that charity will not take is so remote as to be negligible." None of the cases which we have above cited, relating to the improbability of a charity taking anything, have given any effect whatever to the use of the table in such circumstance.